STATE OF NORTH CAROLINA v. RONALD O'NEAL VALENTINE

No. 398A00

(Filed 7 November 2003)

## 1. Evidence— hearsay—state of mind exception—unavailable declarant exception—residual exception

The trial court did not err in a first-degree murder and discharging a firearm into occupied property case by allowing the victim's hearsay statements into evidence under N.C.G.S. § 8C-1, Rules 803(3), 803(24), and 804(b)(5), because: (1) the statements which were made orally to witnesses explained the victim's upset and concerned state of mind; (2) the victim's account of the events established the basis for the victim's fear or concern, and his belief that defendant's actions were so life-threatening that the victim needed to retrieve his gun to protect himself from defendant and defendant's brother; (3) although the trial court failed to make the required findings of fact and conclusions of law regarding the trustworthiness of the hearsay statements, the Supreme Court reviewed the record and concluded that the evidence established that the statements possessed equivalent guarantees of trustworthiness; (4) the victim's statements to two witnesses were more probative in establishing the victim's state of mind shortly after the altercation with defendant than any other evidence the State could have procured by reasonable means; and (5) contrary to defendant's assertion, the statements did not violate his constitutional right to confrontation when the statements fell within a firmly rooted hearsay exception.

## 2. Evidence— hearsay—coconspirator exception

The trial court did not err in a first-degree murder and discharging a firearm into occupied property case by admitting into evidence hearsay statements made by defendant's brother to a witness under the coconspirator exception of N.C.G.S. § 8C-1, Rule 801(d)(E), because: (1) the evidence viewed in a light most favorable to the State was sufficient to meet the State's burden of establishing that a conspiracy between defendant and his brother existed; (2) the actions of both defendant and his brother established that they both intended to harm the victim and that they were acting in unison; (3) the statements were made in furtherance of the conspiracy and were not merely narratives; and (4) even if the statements were not admissible under the coconspir-

ator exception, the statements were not hearsay and thus it was not necessary for the statements to fall within a hearsay exception.

**3. Appeal and Error— preservation of issues—failure to raise constitutional issue at trial**

Although defendant contends the trial court committed plain error in a first-degree murder and discharging a firearm into occupied property case by allowing the State to present evidence that defendant, upon being informed of his constitutional rights under Miranda, chose not to make a statement and requested an attorney, this assignment of error is dismissed because defendant waived this issue by failing to raise his constitutional concerns at trial.

**4. Homicide— first-degree murder—short-form indictment— failure to allege aggravating circumstances**

The trial court did not err in a first-degree murder and discharging a firearm into occupied property case by entering judgment even though the State failed to allege in the short-form indictment the aggravating circumstances supporting the death penalty.

**5. Sentencing— aggravating circumstances—felony involving use or threat of violence to person—right to rebut evidence**

The trial court erred during the sentencing phase of a first-degree murder and discharging a firearm into occupied property case by limiting defendant's right to cross-examine the witness whose testimony supported submission of the N.C.G.S. § 15A-2000(e)(3) aggravating circumstance that defendant had been previously convicted of a felony involving the use or threat of violence to the person, and defendant is entitled to a new capital sentencing proceeding, because the error violated defendant's right to rebut evidence the State submitted.

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Judge Thomas D. Haigwood on 1 February 2000 in Superior Court, Hertford County, upon a jury verdict finding defendant guilty of first-degree murder. On 22 November 2000, the Supreme Court allowed defendant's motion to bypass the Court of Appeals as to his appeal of an additional judgment. On 30 August 2002, upon motion by defendant, the

Supreme Court ordered the parties to submit supplemental briefs addressing the issues set out in *Ring v. Arizona*, 536 U.S. 584, 153 L. Ed. 2d 556 (2002). Heard in the Supreme Court 10 September 2002.

*Roy Cooper, Attorney General, by Robert C. Montgomery, Assistant Attorney General, for the State.*

*Ann B. Petersen for defendant-appellant.*

LAKE, Chief Justice.

Defendant was indicted on 12 January 1998 for one count of first-degree murder and one count of discharging a firearm into occupied property. The cases came on for trial at the 3 January 2000 session of Superior Court, Hertford County.

On 20 January 2000, the jury returned verdicts of guilty on both counts and, following a capital sentencing proceeding, recommended a sentence of death on the conviction for first-degree murder. Defendant was sentenced to death and further received a sentence of thirty-four to fifty months' imprisonment on the conviction for discharging a firearm into occupied property.

The State's evidence at trial tended to show the following: Around 9:00 a.m. on the morning of 29 November 1997, defendant called his former girlfriend, Stephanie Lassiter, and informed her that he planned to come to her home in Ahoskie, North Carolina. Defendant was angry because Steve Hannah, the victim, was staying at Lassiter's home. Defendant told Lassiter to "get that nigger out of [your] house." Lassiter told defendant to leave her alone and hung up the phone. Shortly thereafter, defendant called Lassiter a second time and informed her again that he was coming to her home.

Less than thirty minutes after defendant's second call to Lassiter, defendant arrived at her home. Defendant banged on the door, yelled obscenities at her and demanded that she open the door. When Lassiter opened the door, defendant and his brother, Carl Valentine, barged into the home. Defendant went straight to the bedroom where Hannah was located. After knocking the bedroom door open, defendant went to the kitchen, where he pulled a steak knife out of the kitchen sink. Hannah then went to his car, got a gun and pointed it at defendant. At this point, defendant decided to leave Lassiter's home, but before doing so, he threatened the victim by saying, "You pulled a gun on me, I'll be back."

STATE v. VALENTINE

[357 N.C. 512 (2003)]

After Hannah left Lassiter's home, he told his friend Emmanuel Parker about the altercation with defendant. Parker informed the victim that he knew defendant and assured Hannah that he would try to help resolve the situation. Parker suggested that Hannah hide out at a friend's house until the situation with defendant was resolved.

After talking with Hannah, Parker spoke with both defendant and defendant's brother, Carl. Defendant was adamant that the argument with the victim was not over. During their conversation, Parker noticed that defendant had a baseball bat and a gun in the car with him.

Shortly after the incident at Lassiter's home, defendant and Carl returned to Lassiter's apartment complex. With a baseball bat in his hand, defendant stood in the parking lot yelling, "Tell the nigger I came back."

Around 11:00 a.m. on November 29, two hours after the incident between defendant and the victim, defendant and his brother saw the victim in his car at the home of Wardell and Ryoko Moody. Defendant jumped out of his car, ran towards the victim and shot into the victim's car six times. Four of the six shots hit the victim: two in the right leg, one in the left leg, and one in the chest. The chest wound was fatal.

[1] In his first assignment of error, defendant contends the trial court erred by allowing the victim's hearsay statements into evidence. Emmanuel Parker and Wardell Moody testified regarding statements made by the victim to each of them. The trial court conducted several *voir dire* proceedings to determine the admissibility of these statements and concluded that the statements were admissible under Rules 803(3), 803(24) and 804(b)(5) of the North Carolina Rules of Evidence.

Defendant first argues that the victim's statements were not properly admissible under 803(3) because the victim's statements did not contain any evidence of his then-existing emotions or state of mind.

As a general rule, hearsay evidence is not admissible, *State v. Rivera*, 350 N.C. 285, 288, 514 S.E.2d 720, 722 (1999); however, Rule 803(3) of the North Carolina Rules of Evidence allows for the admission of what is otherwise hearsay testimony when it tends to show the declarant's then-existing state of mind, N.C.G.S. § 8C-1, Rule 803(3) (2001).

This issue was also addressed in *State v. Gary*, 348 N.C. 510, 501 S.E.2d 57 (1998), where the defendant argued that the trial court erred in allowing into evidence the hearsay testimony of the victim's mother regarding threats made by the defendant to the victim. The victim's mother testified, "[The victim] said, '[The defendant] told me he'd kill me if I left him.' " *Id.* at 519, 501 S.E.2d at 64. The defendant argued that the testimony of the victim's mother was not properly admissible to establish the victim's fearful state of mind. *Id.* at 518, 501 S.E.2d at 63. This Court concluded that the victim's factual statements fell within the purview of Rule 803(3) because the facts served "to demonstrate the basis for [the victim's] fear." *Id.* at 522, 501 S.E.2d at 65.

Mere recitations of fact, totally devoid of emotion, are inadmissible under Rule 803(3). *State v. Hardy*, 339 N.C. 207, 229, 451 S.E.2d 600, 612 (1994). In *Hardy*, the trial court admitted excerpts from the victim's diary as hearsay statements under Rule 803(3). 339 N.C. at 227, 451 S.E.2d at 611. This Court concluded that the diary entries were inadmissible because they were "merely a recitation of facts which describe various events." *Id.* at 228, 451 S.E.2d at 612. When referring specifically to one of the diary entries, this Court noted that the entry expressed no emotion and seemed to have been written in a calm and detached manner. As a result, this Court concluded that the diary entry did not establish the victim's state of mind. *Id.* at 229-30, 451 S.E.2d at 613.

In the first set of hearsay statements in the instant case, Emmanuel Parker testified that the victim appeared "upset about something" and that the victim inquired as to whether Parker knew any "O'Neal Valentino or Valentine." The victim also told Parker about the confrontation which took place earlier that morning at Lassiter's home. The victim told Parker how defendant had pulled a knife on him and why the victim felt he had to get his gun so that he "could keep them off him" and so that he could "get out."

In the second set of hearsay statements, Wardell Moody testified that the victim asked him if he knew anyone by the name of "Valentino or Valentine." The victim told Moody that "[the victim] was at this girl's house and that two brothers came in on them. One of them had a knife and [the victim] pulled his gun on them and he backed them off." Moody also testified that the victim acted "concerned."

STATE v. VALENTINE

[357 N.C. 512 (2003)]

Unlike *Hardy*, the statements in the case *sub judice* were made orally by the victim to two witnesses rather than being merely recorded on paper in a calm, detached manner. The factual circumstances in the statements made to both Parker and Moody explained the victim's "upset" and "concern[ed]" state of mind. Because the statements made by the victim to both Parker and Moody related directly to the victim's fear of defendant, the statements were admissible to establish the victim's then-existing state of mind.

Defendant further contends that the hearsay statements admitted through the testimony of Parker and Moody were factually inconsistent with Lassiter's testimony and that the State chose to admit the victim's hearsay statements because they provided a more preferential presentation of the facts than that provided by Lassiter's testimony. Specifically, defendant asserts that Lassiter's version of the events revealed that the victim did not get his gun from the car in order to get away from defendant and that defendant never threatened the victim with a knife and never made any statement to the victim until after the victim threatened defendant with a gun.

The victim's statements to Parker and Moody establish that the victim *interpreted* defendant's actions as "pull[ing] a knife out on him" and that the victim felt he needed to get his gun in an effort to "back[] them off." The victim's account of the events is important because it establishes the basis for the victim's "fear" or "concern": his belief that defendant's actions were so life-threatening that he needed to retrieve the gun to protect himself from defendant and defendant's brother.

Other than admission under Rule 803(3), the trial court's alternative bases for admission of the victim's hearsay statements to Parker and Moody were the "residual exceptions," Rules 803(24) and 804(b)(5). Defendant asserts that these bases for admission were also error because the trial court did not make or include findings of fact or conclusions of law in the record.

Once a trial court establishes that a declarant is unavailable pursuant to Rule 804(a) of the North Carolina Rules of Evidence, there is a six-part inquiry to determine the admissibility of the hearsay evidence proffered under Rule 804(b)(5). *State v. Fowler*, 353 N.C. 599, 608-09, 548 S.E.2d 684, 696 (2001), *cert. denied*, 535 U.S. 939, 152 L. Ed. 2d 230 (2002); *State v. Triplett*, 316 N.C. 1, 8-9, 340 S.E.2d 736, 741 (1986). Rule 803(24) of the North Carolina Rules of Evidence is essentially identical to Rule 804(b)(5), but it does not require that the

STATE v. VALENTINE

[357 N.C. 512 (2003)]

declarant be unavailable. *Triplett*, 316 N.C. at 7, 340 S.E.2d at 740. Under either of the two residual exceptions to the hearsay rule, the trial court must determine the following: (1) whether proper notice has been given, (2) whether the hearsay is not specifically covered elsewhere, (3) whether the statement is trustworthy, (4) whether the statement is material, (5) whether the statement is more probative on the issue than any other evidence which the proponent can procure through reasonable efforts, and (6) whether the interests of justice will be best served by admission. *State v. Smith*, 315 N.C. 76, 91-98, 337 S.E.2d 833, 844-48 (1985); *accord* N.C.G.S. § 8C-1, Rule 804(b)(5) (2001); *see also Triplett*, 316 N.C. at 8-10, 340 S.E.2d at 740-41.

Defendant argues that the third step of the analysis—determining the equivalent circumstantial guarantees of trustworthiness of the hearsay statements—was not established. When determining the trustworthiness, the following considerations are at issue: (1) whether the declarant had personal knowledge of the underlying events, (2) whether the declarant is motivated to speak the truth or otherwise, (3) whether the declarant has ever recanted the statement, and (4) whether the declarant is available at trial for meaningful cross-examination. *State v. King*, 353 N.C. 457, 479, 546 S.E.2d 575, 592 (2001), *cert. denied*, 534 U.S. 1147, 151 L. Ed. 2d 1002 (2002); *State v. Tyler*, 346 N.C. 187, 195, 485 S.E.2d 599, 603, *cert. denied*, 522 U.S. 1001, 139 L. Ed. 2d 411 (1997); *State v. Nichols*, 321 N.C. 616, 624, 365 S.E.2d 561, 566 (1988).

The trial court is required to make findings of fact and conclusions of law when determining the trustworthiness of a hearsay statement. *State v. Swindler*, 339 N.C. 469, 474, 450 S.E.2d 907, 910-11 (1994); *State v. Deanes*, 323 N.C. 508, 515, 374 S.E.2d 249, 255 (1988), *cert. denied*, 490 U.S. 1101, 104 L. Ed. 2d 1009 (1989). The State concedes that the trial court "erroneously failed to make the required findings of fact and conclusions of law." Because the trial court failed to determine whether the victim's statements to Parker and Moody contained "equivalent circumstantial guarantees of trustworthiness" necessary for admission under the exceptions to the hearsay rule, we will review the record and make our own determination.

This Court has previously addressed cases where the trial court failed to make the findings necessary to establish the trustworthiness of a hearsay statement. In *State v. Daughtry*, 340 N.C. 488, 459 S.E.2d 747 (1995), *cert. denied*, 516 U.S. 1079, 133 L. Ed. 2d 739 (1996), the trial court concluded that the hearsay statement at issue possessed the requisite trustworthiness but failed to make findings of fact in

support of its conclusion of law. *Id.* at 514, 459 S.E.2d at 760. Although the trial court's failure to make findings of fact was erroneous, this Court reviewed the record and concluded that the record supported the trial court's conclusion. *Id.* In addition, this Court noted the overwhelming evidence in support of the defendant's guilt and concluded that any error in the admission of the hearsay statement was harmless beyond a reasonable doubt. *Id.*

In *Swindler*, the trial court also failed to make any particularized findings of fact or conclusions of law regarding whether the hearsay statement at issue possessed "equivalent circumstantial guarantees of trustworthiness." 339 N.C. at 474, 450 S.E.2d at 911. The trial court summarily concluded, "I think that there are some indications that this is a truthful statement." *Id.* This bare assertion was inadequate to establish the trustworthiness of the hearsay statement; however, this Court performed its own analysis on the trustworthiness of the statement using the four considerations addressed in *King. Id.* at 474-75, 450 S.E.2d at 911.

In applying the *King* considerations to establish the trustworthiness in the case *sub judice*, we note that the hearsay statements at issue were made by the victim to Parker and Moody on 29 November 1997. First, the victim had personal knowledge of the events described in the statements, and the statements were made within two hours after the initial altercation between defendant and the victim. Second, the victim had no reason to lie to Parker and Moody, and there is no indication he would have benefitted from altering the story. Third, the victim never recanted the statements he made to Parker and Moody, and the victim died shortly after the statements were made. Fourth and finally, the victim was unavailable to testify, having died from gunshot wounds shortly after the statements were made. In sum, the evidence in the record establishes that the statements possessed "equivalent circumstantial guarantees of trustworthiness."

Having established the "trustworthiness" prong under Rule 804(b)(5), we turn now to the rest of the test. The State provided defendant with timely notice of its intent to introduce the victim's hearsay statements, and defendant did not allege that he failed to receive notice of the State's intent to use the hearsay statements. Without the victim's statements, the jurors would not have learned how the victim felt about the altercation that occurred at Lassiter's home or hear the victim's interpretation of the facts which supported his then-existing state of mind. This information was "material" to the

case in that the circumstances of the relationship between defendant and the victim are relevant to establish defendant's motive for killing the victim.

The testimonies of Parker and Moody provided insight into how the victim felt following the altercation with defendant. Further, the victim's rendition of the altercation provided jurors with an understanding of how the victim perceived the events that had occurred at Lassiter's home shortly before the murder. The victim's statements to Parker and Moody were more probative in establishing the victim's state of mind shortly after the altercation with defendant than any other evidence the State could have procured by reasonable means.

The North Carolina Rules of Evidence provide that the rules "shall be construed to secure fairness in administration, elimination of unjustifiable expense and delay, and promotion of growth and development of the law of evidence to the end that the truth may be ascertained and proceedings justly determined." N.C.G.S. § 8C-1, Rule 102(a) (2001). By permitting the victim's statements to be admitted into evidence, the trial court served the "interests of justice" by providing jurors with the necessary tools to ascertain the truth.

Defendant further alleges that the admission of the hearsay statements violated his constitutional right to confrontation. Specifically, he asserts that because the hearsay statements were not admissible under a "firmly rooted" exception, the statements were not sufficiently reliable to satisfy the Sixth Amendment's Confrontation Clause requirements for admissibility. Evidence which falls within a "firmly rooted" hearsay exception is sufficiently reliable to prevent violation of a defendant's right to confrontation. *State v. Jackson,* 348 N.C. 644, 651, 503 S.E.2d 101, 106 (1998); *accord State v. Gainey,* 343 N.C. 79, 86, 468 S.E.2d 227, 231-32 (1996). As noted above, the statements at issue fall within a firmly rooted hearsay exception; therefore, this contention is without merit.

Based on the foregoing, we conclude that the victim's statements were admissible under Rule 803(3) and under the exceptions to the hearsay rule, Rule 803(24) and Rule 804(b)(5).

[2] In his next assignment of error, defendant asserts that the trial court erred by admitting into evidence statements made by defendant's brother, Carl. Following a *voir dire,* the trial court concluded that the statements were admissible pursuant to the co-conspirator

exception. N.C.G.S. § 8C-1, Rule 801(d)(E) (2001). Defendant contends the State did not establish the existence of a conspiracy between defendant and Carl. Assuming first, *arguendo*, that the statements were hearsay, we consider whether these statements fall within the co-conspirator exception.

"A statement by one conspirator made during the course and in furtherance of the conspiracy is admissible against his co-conspirators." *State v. Mahaley*, 332 N.C. 583, 593, 423 S.E.2d 58, 64 (1992), *cert. denied*, 513 U.S. 1089, 130 L. Ed. 2d 649 (1995). Admission of a conspirator's statement into evidence against a co-conspirator requires the State to establish that: "(1) a conspiracy existed; (2) the acts or declarations were made by a party to it and in pursuance of its objectives; and (3) while it was active, that is, after it was formed and before it ended." *State v. Lee*, 277 N.C. 205, 213, 176 S.E.2d 765, 769-70 (1970), *quoted in Mahaley*, 332 N.C. at 593-94, 423 S.E.2d at 64. Proponents of a hearsay statement under the co-conspirator exception must establish a *prima facie* case of conspiracy, without reliance on the statement at issue. *State v. Williams*, 345 N.C. 137, 141, 478 S.E.2d 782, 784 (1996); *State v. Tilley*, 292 N.C. 132, 138, 232 S.E.2d 433, 438 (1977). In establishing the *prima facie* case, the State is granted wide latitude, and the evidence is viewed in a light most favorable to the State. *State v. Bonnett*, 348 N.C. 417, 438, 502 S.E.2d 563, 577 (1998), *cert. denied*, 525 U.S. 1124, 142 L. Ed. 2d 907 (1999); *see also Williams*, 345 N.C. at 143, 478 S.E.2d at 785.

In the present case, Emmanuel Parker testified about statements made to him by Carl, defendant's brother, at two different times on the day of 29 November 1997. The first statements were made to Parker shortly after Parker spoke with the victim about the events which had transpired at Lassiter's home. According to Parker, Carl told him, "[Y]ou know where we are from and if somebody pulls a knife or a gun out [on] you, you are supposed to get smoked." Parker also testified that when he tried to reason with Carl by telling him that the situation was not worth killing anybody over, Carl agreed with Parker and told him, "I'm through," and "it's over with," but "you need to talk to [defendant]."

As to the second series of statements made by Carl later that morning, Parker testified that he again tried to persuade Carl that the altercation with the victim did not justify a murder. Carl again agreed with Parker and said, "I should just take the baseball bat and f--- [the victim] up."

STATE v. VALENTINE

[357 N.C. 512 (2003)]

Defendant argues that the evidence was insufficient to establish a *prima facie* case of conspiracy and that even if the State had proven the existence of a conspiracy, the statements attributed to Carl were not made in the furtherance of the conspiracy. Specifically, defendant contends that Carl's statements were merely "narratives of things to be done" and were therefore inadmissible as statements in furtherance of the conspiracy.

"A criminal conspiracy is an agreement between two or more persons to do an unlawful act or to do a lawful act by unlawful means." *State v. Lamb*, 342 N.C. 151, 155, 463 S.E.2d 189, 191 (1995); *see also State v. Barnes*, 345 N.C. 184, 216, 481 S.E.2d 44, 61, *cert. denied*, 522 U.S. 876, 139 L. Ed. 2d 134 (1997), *and cert. denied*, 523 U.S. 1024, 140 L. Ed. 2d 473 (1998). This Court has recognized the "inherent difficulty" in establishing a criminal conspiracy. *Mahaley*, 332 N.C. at 594, 423 S.E.2d at 65; *accord Tilley*, 292 N.C. at 139, 232 S.E.2d at 438. However, in establishing a criminal conspiracy, direct proof is not required. *State v. Gibbs*, 335 N.C. 1, 48, 436 S.E.2d 321, 348 (1993), *cert. denied*, 512 U.S. 1246, 129 L. Ed. 2d 881 (1994). "It may be, and generally is, established by a number of indefinite acts, each of which, standing alone, might have little weight, but, taken collectively, they point unerringly to the existence of a conspiracy." *State v. Whiteside*, 204 N.C. 710, 712, 169 S.E. 711, 712 (1933), *quoted in Gibbs*, 335 N.C. at 48, 436 S.E.2d at 348. In finding the existence of a criminal conspiracy, jurors are allowed to make the logical inference that "one who conspires to bring about a result intends the accomplishment of that result, or of *anything which naturally flows from its attempted accomplishment*." *State v. Small*, 301 N.C. 407, 419, 272 S.E.2d 128, 136 (1980) (emphasis added).

As a general rule, the acts and declarations of a conspirator are not admissible when they come in the form of narratives or descriptions. *State v. Wells*, 219 N.C. 354, 356, 13 S.E.2d 613, 614 (1941); *see also State v. Potter*, 252 N.C. 312, 314, 113 S.E.2d 573, 575 (1960) (holding that testimony was erroneously admitted against the defendant because it was merely a narrative regarding what the defendant had previously said and done). Narrative declarations are admissible only when admitted against the defendant who made them or in whose presence the statements were made. *Wells*, 219 N.C. at 356, 13 S.E.2d at 614.

The following evidence was presented at trial and tended to establish a conspiracy: Carl accompanied defendant to Lassiter's home after Lassiter told defendant she did not want defendant to

come to her home and after defendant had made threats regarding the victim. After defendant barged into Lassiter's home, Carl also entered the home. Further, Carl was present when defendant made his way to Lassiter's bedroom, knocked open the bedroom door, saw the victim and went to the kitchen where defendant retrieved a steak knife. Carl drove the car as he and defendant left Lassiter's home following defendant's threat to the victim, "I'll be back."

Carl drove defendant back to Lassiter's home shortly after the altercation. During this second visit, defendant displayed a baseball bat and made threatening statements about the victim. When defendant left Lassiter's home the second time, Carl continued to drive, with defendant riding as a passenger. When defendant and Carl talked with Parker, defendant expressed his plans to get even with the victim and showed Parker the gun he was carrying.

Just prior to the murder, defendant was seen exiting the passenger side of a black car. The same black car was seen leaving the site of the shooting which resulted in the victim's death. This evidence, when viewed in a light most favorable to the State, is sufficient to meet the State's burden of establishing that a conspiracy between defendant and Carl existed.

The actions of both Carl and defendant clearly establish that they both intended to harm the victim and that they were acting in unison. Carl was aware that defendant intended to kill the victim, as defendant stated many times in Carl's presence that he planned to kill the victim. Also, defendant was armed with a gun and a baseball bat as he rode around town with Carl. The evidence further shows that Carl intended to harm the victim, as Carl accompanied defendant to Lassiter's home after defendant had made threats towards the victim on the telephone. Carl is responsible for driving himself and defendant to and from the scene where the victim was killed. In sum, the evidence shows that both Carl and defendant intended and collaborated to harm the victim in a way likely to lead to the death of the victim.

We further conclude that the statements at issue were made in furtherance of the conspiracy and were not merely narratives. The State submitted substantial evidence that Carl and defendant had entered into an agreement and a collaborative effort to harm the victim. Carl's statements to Parker that he should just "f--- [the victim] up" and Carl's statement that the victim's actions resulted in the need,

according to custom, to "smoke" him were statements made in furtherance of the objective to harm the victim. We conclude that this evidence tended to show an implicit agreement and collaborative effort between Carl and defendant to commit the murder.

Accordingly, we conclude that Carl's statements were properly admissible under Rule 801(d)(E) as statements of a co-conspirator. Even if the statements were not properly admissible under the co-conspirator exception, we conclude that the statements were not hearsay; therefore, it was not necessary for the statements to fall within a hearsay exception.

The probative value of a nonhearsay statement "does not depend, in whole or in part, upon the competency and credibility of any person other than the witness." *State v. Dilliard*, 223 N.C. 446, 447, 27 S.E.2d 85, 86 (1943); *see also State v. Holder*, 331 N.C. 462, 484, 418 S.E.2d 197, 209 (1992) (witness' statements about the defendant's conduct were not hearsay, as they were not probative of the truth and were admitted to establish that the victim made the statements). Further, a nonhearsay statement does not put the truth or falsity of the statement at issue. *Dilliard*, 223 N.C. at 447, 27 S.E.2d at 86-87.

Specifically, Carl's initial statement that "where we are from" pulling a knife or gun on someone results in getting "smoked" was not offered to establish the truth of this statement: that this was in fact the custom in the area where defendant and Carl were raised. Rather, the statement was offered to show that defendant intended to shoot the victim. Likewise, Carl's statement made during the same conversation to Parker that "I'm through," but "you need to talk to [defendant]" was offered to establish that at that time defendant had a plan to kill the victim. Offered in connection with one another, the statements serve to demonstrate that the brothers had a common plan to harm the victim.

Similarly, Carl's second statement that defendant and Carl should just assault the victim with a baseball bat instead of kill the victim was not admitted to establish the truth of this statement: that in fact Carl thought a better alternative was to assault the victim with a baseball bat. Rather, the statement was admitted to further demonstrate a common plan between defendant and Carl. With both sets of Carl's statements, the truth or falsity thereof was not at issue. The weight that jurors chose to give these statements in deciding the issue of defendant's guilt or innocence depended upon the credibility of wit-

ness Parker in relating the statements. The statements at issue were nonhearsay. The trial court did not err in allowing the admission of these statements.

[3] In his final guilt-innocence phase issue, defendant argues that the trial court committed plain error by allowing the State to present evidence that defendant, upon being informed of his constitutional rights under *Miranda,* chose not to make a statement and requested an attorney. At two points during the trial, the chief investigating officer, Detective Scott Outlaw, was asked whether defendant made any response after being advised of his *Miranda* rights. When Detective Outlaw was questioned the first time, defendant objected, and the trial court sustained the objection. The second time Detective Outlaw was asked about defendant's failure to make any statement, defendant made no objection. Detective Outlaw testified that after he read defendant his *Miranda* rights, he asked if defendant wanted to "obtain the services of an attorney." Defendant, according to Detective Outlaw, replied that he wanted to speak to an attorney. Detective Outlaw then testified that defendant did not make any other statements.

"[A]dmission of evidence without objection waives *prior* or subsequent objection to the admission of evidence of a similar character." *State v. Campbell,* 296 N.C. 394, 399, 250 S.E.2d 228, 231 (1979) (emphasis added); *see also State v. Alford,* 339 N.C. 562, 569-70, 453 S.E.2d 512, 516 (1995) (holding that the defendant waived his objection by failing to object to the admission of the same evidence at other points in the trial); *State v. Maccia,* 311 N.C. 222, 229, 316 S.E.2d 241, 245 (1984) (holding that the defendant waived his original objection by failing to object when the prosecution later returned to the same subject material).

Defendant's argument is based upon his Fifth Amendment right to silence and his Sixth Amendment right to counsel. However, defendant did not raise these constitutional concerns before reaching this Court. The failure to raise a constitutional issue before the trial court bars appellate review. N.C. R. App. P. 10(b)(1); *State v. Wiley,* 355 N.C. 592, 624, 565 S.E.2d 22, 44-45 (2002), *cert. denied,* 537 U.S. 1117, 154 L. Ed. 2d 795 (2003); *State v. Golphin,* 352 N.C. 364, 411, 533 S.E.2d 168, 202 (2000), *cert. denied,* 532 U.S. 931, 149 L. Ed. 2d 305 (2001). Based upon our long-established law, defendant has waived this issue, and he is barred from raising it on appellate review before this Court. This assignment of error is dismissed.

[4] In a further issue arising subsequent to defendant's trial, as a result of the United States Supreme Court's recent ruling in *Ring v. Arizona*, 536 U.S. 584, 153 L. Ed. 2d 556, defendant asserts that the State's failure to allege in the indictment the aggravating circumstances supporting the death penalty left the trial court without jurisdiction to enter judgment on the capital crime. Specifically, he argues that *Ring* held that aggravating circumstances are "elements" of the crime of capital murder and must be alleged in the indictment because aggravating circumstances can increase the maximum penalty. Defendant further argues that the failure of the short-form murder indictment to allege any aggravating circumstance was a jurisdictional defect requiring that his death sentence be vacated and a sentence of life imprisonment without parole be imposed. We considered and rejected this argument recently in *State v. Hunt*, 357 N.C. 257, 582 S.E.2d 593, *cert. denied*, —— U.S. ——, —— L. Ed. 2d ——, 72 U.S.L.W. 3234 (2003). Accordingly, this assignment of error is overruled.

For the foregoing reasons, upon our full consideration of the record on appeal and arguments of counsel on all issues appropriately presented, we conclude that defendant received a fair trial, free from prejudicial error. We therefore uphold the guilty verdicts.

[5] As to the assignment of error arising from the sentencing phase, defendant argues that the trial court erred by limiting his right to cross-examine the witness whose testimony supported submission of the (e)(3) aggravating circumstance. Defendant asserts that this error entitles him to a new trial.

The sole aggravator submitted to the jury was the (e)(3) aggravating circumstance, that "defendant had been previously convicted of a felony involving the use or threat of violence to the person." N.C.G.S. § 15A-2000(e)(3). To prove the existence of the (e)(3) aggravator, three distinct prongs must be established: (1) the defendant has been convicted of a felony, (2) the felony for which he was convicted involved the "use or threat of violence to the person," and (3) the conduct supporting the conviction occurred prior to the events giving rise to the capital felony charge. *State v. Goodman*, 298 N.C. 1, 22, 257 S.E.2d 569, 583 (1979); *see also State v. Hamlette*, 302 N.C. 490, 503-04, 276 S.E.2d 338, 347 (1981).

Although a certified judgment is sufficient to establish the existence of all three prongs of the test, the State is "entitled to present witnesses in the penalty phase of the trial to prove the cir-

cumstances of prior convictions and is not limited to the introduction of evidence of the record of conviction." *State v. Roper*, 328 N.C. 337, 365, 402 S.E.2d 600, 616, *cert. denied*, 502 U.S. 902, 116 L. Ed. 2d 232 (1991); *see also State v. Blakeney*, 352 N.C. 287, 316, 531 S.E.2d 799, 819 (2000), *cert. denied*, 531 U.S. 1117, 148 L. Ed. 2d 780 (2001). Conversely, a defendant may present evidence which mitigates his involvement in the previous felony supporting the (e)(3) aggravating circumstance. *Hamlette*, 302 N.C. at 504, 276 S.E.2d at 347; *see also State v. Taylor*, 304 N.C. 249, 279, 283 S.E.2d 761, 780 (1981) (holding that the "better rule here is to allow both sides to introduce evidence in support of aggravating and mitigating circumstances which have been admitted into evidence by stipulation"), *cert. denied*, 463 U.S. 1213, 77 L. Ed. 2d 1398 (1983).

The State presented evidence that on 11 March 1998, defendant was convicted of assault with a deadly weapon inflicting serious injury. The victim, Thomas Futrell, testified about the assault. During cross-examination of Futrell, defendant tried to question him regarding defendant's Exhibit Number 32. Exhibit Number 32 was a hand-printed statement, titled "Affidavit," which contained Futrell's signature on the initial line of written material. At the bottom of the document was what appeared to be a notary's seal with the signature, "Patrina Brown." The substance of Exhibit Number 32 stated that defendant was not involved in the beating of Futrell. When questioned by defendant, Futrell repeatedly contended that he signed only a piece of *blank* paper when defendant pointed out that Exhibit Number 32 was a signed statement that defendant did not assault Futrell. The State objected to this line of questioning, and the trial court conducted *voir dire* to determine whether defendant's questioning of Futrell was proper.

During *voir dire*, defendant argued that the State was allowed to bolster the evidence regarding the assault conviction with the testimony of the alleged victim and that he should have the same right to present evidence which would contradict or mitigate the State's evidence. Futrell testified during *voir dire* that his signature on Exhibit Number 32 was his "drunken" signature, that the document was signed when it was only a blank sheet of paper, and that the paper was not signed in the presence of the notary. The trial court ruled that defendant would be allowed to ask Futrell only to identify Exhibit Number 32 and generally to ask Futrell whether he had ever stated that defendant did not take part in assaulting him. The trial court further ruled that defendant would not be allowed to refer to

**STATE v. VALENTINE**

[357 N.C. 512 (2003)]

the content of Exhibit Number 32 if Futrell denied having made a statement that defendant was not involved in his assault. Defendant contends that these limitations on his right to cross-examine Futrell were error.

We agree and conclude that this error violated defendant's right to rebut the evidence the State submitted in support of the (e)(3) aggravating circumstance. However, we disagree with defendant's contention that he is entitled to a new trial. The error occurred during the sentencing phase, and any impact from this error is limited to the sentencing proceeding. Accordingly, we hold that defendant is entitled to a new capital sentencing proceeding.

## PRESERVATION ISSUES

Defendant raises four additional issues which he concedes have been previously decided contrary to his position by this Court: (1) the trial court erred in allowing the State to try defendant for first-degree murder when the short-form indictment failed to provide him with notice of the charge of first-degree, capital murder; (2) the trial court erred in instructing the jury on Issue Four that it must "unanimously" find that the aggravating circumstance was sufficiently substantial for imposition of the death penalty when compared with the mitigating circumstances; (3) the trial court erred in instructing the jury that it had a "duty" to recommend a sentence of death if it found that the mitigating circumstances were insufficient to outweigh the aggravating circumstance; and (4) the jury instructions defining mitigating circumstances unconstitutionally limited the jury's consideration.

Defendant raises these issues for the purpose of permitting this Court to reexamine its prior holdings and also for the purpose of preserving them for possible further judicial review of this case. We have considered defendant's arguments on these issues and find no compelling reason to depart from our prior holdings. These assignments of error are overruled.

For the reasoning set forth above regarding the (e)(3) aggravating circumstance, we must vacate defendant's sentence of death and remand to the Superior Court, Hertford County, for a new capital sentencing proceeding pursuant to N.C.G.S. § 15A-2000.

NO. 97CRS4688, FIRST-DEGREE MURDER: GUILT-INNOCENCE PHASE—NO ERROR; SENTENCING PHASE—REMANDED FOR NEW CAPITAL SENTENCING PROCEEDING.

NO. 98CRS208, DISCHARGING FIREARM INTO OCCUPIED PROPERTY: NO ERROR.